IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA
SOUTHEASTERN DIVISION

| | |
|---|---|
| States of North Dakota, Alaska, Arizona, Arkansas, Colorado, Idaho, Missouri, Montana, Nebraska, Nevada, South Dakota, and Wyoming; New Mexico Environment Department; and New Mexico State Engineer,<br><br>Plaintiffs,<br><br>vs.<br><br>U.S. Environmental Protection Agency, Regina McCarthy in her official capacity as Administrator of the U.S. Environmental Protection Agency, U.S. Army Corps of Engineers, Jo Ellen Darcy in her official capacity as Assistant Secretary of the Army (Civil Works),<br><br>Defendants. | Civil No. 3:15-cv-59<br><br>**MEMORANDUM OPINION AND ORDER GRANTING PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION** |

## I. SUMMARY OF DECISION

Original jurisdiction is vested in this court and not the court of appeals because the "Clean Water Rule: Definition of Waters of the United States," jointly promulgated by the U.S. Environmental Protection Agency and U.S. Army Corps of Engineers, has at best only an attenuated connection to any permitting process. If the exceptionally expansive view advocated by the government is adopted, it would encompass virtually all EPA actions under the Clean Water Act, something precisely contrary to Section 1369(b)(1)(F)'s grant of jurisdiction.

The court finds that under either standard – "substantial likelihood of success on the

1

merits" or "fair chance of success" – the States are likely to succeed on their claim because (1) it appears likely that the EPA has violated its Congressional grant of authority in its promulgation of the Rule at issue, and (2) it appears likely the EPA failed to comply with APA requirements when promulgating the Rule. Additionally, the court finds the other factors relevant to the inquiry weigh in favor of an injunction.

## II. PROCEDURAL BACKGROUND

On April 21, 2014, the United States Army Corps of Engineers and the Environmental Protection Agency ("EPA") (collectively "the Agencies") issued a proposed rule to change the definition of "Waters of the United States" under the Clean Water Act. Following a period for comment, the Agencies promulgated a final rule ("the Rule") on June 29, 2015, which defines waters of the United States. The Rule has an effective date of August 28, 2015.

On June 29, 2015, twelve States[1] and the New Mexico Environment Department and the New Mexico State Engineer (collectively "the States") filed a complaint against the Agencies, the EPA Administrator in her official capacity, and the Assistant Secretary of the Army (Civil Works) in her official capacity.[2] On August 10, 2015, the States filed a motion for a preliminary injunction.[3] A hearing was held on the motion on August 21, 2015. The court, having considered the entire record as now developed including evidence presented at the hearing and the arguments of counsel, issues this memorandum opinion and order.

---

[1] States of North Dakota, Alaska, Arizona, Arkansas, Colorado, Idaho, Missouri, Montana, Nebraska, Nevada, South Dakota, and Wyoming.

[2] Doc. #1.

[3] Doc. #32.

### III. ANALYSIS

*1.    Jurisdiction*

Title 33, of the United States Code, § 1369(b)(1)[4] defines the circumstances under which the United States Courts of Appeals have exclusive jurisdiction over an action of the EPA Administrator. Implicated here are the provisions of subsections (b)(1)(E) and (b)(1)(F) of § 1369. Section 1369(b)(1)(E) posits jurisdiction in the courts of appeals where the Administrator has approved or promulgated "any effluent limitation or other limitation under section 301, 302, 306, or 405, [33 USCS § 1311, 1312, 1316, or 1345]". "Effluent limitations" are defined by the act as "any restriction established by a state or the [EPA] on quantities, rates, and concentrations of chemical, physical, biological, and other constituents which are discharged from point sources into navigable waters."[5]

The Rule itself imposes no "effluent limitation." It merely redefines what constitutes "waters of the United States."[6] This is made plain by the specific language of the Rule itself, as it unequivocally states that it "imposes no enforceable duty on any state, local, or tribal governments, or the private sector, and does not contain regulatory requirements that might significantly or uniquely affect small governments."[7]

The Agencies' claim that the Rule is an "other" limitation is equally unavailing. "[A]n agency action is [an 'other] limitation' within the meaning of section 509(b)(1)(E) if entities

---

[4] Alternately known as, and commonly referred to as, § 509(b)(1) of The Federal Water Pollution Control Act.

[5] 33 U.S.C. § 1362(11).

[6] 80 Fed. Reg. 37054.

[7] 80 Fed. Reg. 37102.

subject to the CWA's permit requirements face new restrictions on their discretion with respect to discharges or discharge-related processes."[8] The Eighth Circuit Court of Appeals has noted that this phrase "leaves much to the imagination."[9] The Fourth Circuit Court of Appeals has defined an "other limitation" as "a restriction on the untrammeled discretion of the industry . . .[as it existed prior to the passage of the [CWA]."[10]

The Rule here imposes no "other limitation" upon the Plaintiff States. At the hearing, the EPA argued that the Rule places no new burden or requirements on the States, a position supported by the language of the Rule itself at 80 F.R. 37102. The contention is that the States have exactly the same discretion to dispose of pollutants into the waters of the United States after the Rule as before. Rather, the Rule merely changes what constitutes waters of the United States.

Section 1369(b)(1)(F) grants the courts of appeals jurisdiction in cases involving the "issuing or denying [of] any permit under section 1342 of this title." In Iowa League of Cities, the Eighth Circuit noted, that the Supreme Court, in Crown Simpson Pulp Co. v. Costle,[11] "interpreted broadly the direct appellate review provision" of § 1369(b)(1)(F).[12] In Crown Simpson, the Supreme Court interpreted Subsection F "to extend jurisdiction to those actions that have 'the precise effect' of an action to issue or deny a permit."[13] The

---

[8] Iowa League of Cities v. E.P.A., 711 F.3d 844, 866 (8th Cir. 2013).

[9] Id.

[10] Va. Elec. & Power Co. (VEPCO) v. Costle, 566 F.2d 446, 450 (4th Cir. 1977).

[11] 445 U.S. 193, 196.

[12] 711 F.3d at 862.

[13] Friends of the Everglades v. U.S. E.P.A., 699 F.3d 1280, 1287 (11th Cir. 2012) (citing Crown Simpson Pulp Co. v. Costle, 445 U.S. 193, 196 (1980)).

4

precise holding in Crown Simpson is that original jurisdiction rests in the courts of appeal "when the action of the Administrator is functionally similar to the denial or issuance of a permit."[14]

The case at bar is much like that in Friends of the Everglades. The Rule "neither issues nor denies a permit"[15] Indeed, the Rule has at best an attenuated connection to any permitting process. It simply defines what waters are within the purview of the "waters of the United States."[16] This does not in itself implicate § 1369(b)(1)(F) because it is simply not the functional equivalent or similar to an action of the administrator in denying or issuing a permit.[17]

If the exceptionally expansive view advocated by the government is adopted, it would encompass virtually all EPA actions under the Clean Water Act. It is difficult to imagine any action the EPA might take in the promulgation of a rule that is not either definitional or regulatory. This view of §1369(b)(1)(F)'s grant of jurisdiction would run precisely contrary to Congress' intent in drafting the court of appeals jurisdictional provision as recognized in the Supreme Court in National Cotton Council of America v. U.S. E.P.A..[18]

The relationship between issuing or denying a permit and the Rule at issue is tangential to issuance or denial of a permit–a classic red herring. Under these

---

[14] Id. (citing Crown Simpson Pulp Co., 445 U.S. at 196).

[15] Friends of the Everglades, 699 F.3d at 1287.

[16] 80 Fed. Reg. 37104-05.

[17] See Friends of the Everglades, 699 F.3d at 1287 (citing Crown Simpson Pulp Co., 445 U.S. at 196).

[18] See National Cotton Council of America v. U.S. E.P.A., 553 F.3d 927, 933 (6th Cir. 2009) (quoting Lake Cumberland Trust, Inc. v. EPA, 954 F.2d 1218 (6th Cir. 1992) ("Congress did not intend court of appeals jurisdiction over all EPA actions taken pursuant to the Act.")).

5

circumstances, original jurisdiction lies in this court and not the court of appeals.

## *2. Preliminary Injunction Motion.*

The court applies the well-known four-factor inquiry in determining whether or not a preliminary injunction should issue.[19] Commonly referred to as the Dataphase factors, the court weighs (1) the threat of irreparable harm to the movant; (2) the balance of harms; (3) the movant's likelihood of success on the merits; and (4) the public interest.[20]

### *A. Likelihood of Success on the Merits*

The court initially considers likelihood of success on the merits because if the movant fails to establish a likelihood of success, the quest for a preliminary injunction fails and the discussion is ended.

When issuing injunctive relief, the court must determine whether the moving party's claim has a likelihood of success on the merits.[21] Two separate likelihood standards can be applied by a reviewing court. A "substantial likelihood of success on the merits" standard applies when the issue arises out of a statute or regulation made in the presumptively reasoned democratic process.[22] In cases that do not meet the "presumptively reasoned requirement" a "fair chance of success" standard articulated in Heartland Acad. Cmty. Church v. Waddle[23] is applied.

As presaged by the phrasing of the cases describing the applicability of the higher

---

[19] McKinney ex rel. N.L.R.B. v. Southern Bakeries, 786 F.3d 1119, 1122 (8th Cir. 2015).

[20] Dataphase Systems, Inc. v. C.L. Systems, Inc., 640 F.2d 109, 112-13 (8th Cir. 1981).

[21] Id. at 113.

[22] Planned Parenthood Minnesota, North Dakota, South Dakota v. Rounds, 530 F.3d 724, 732 (8th Cir. 2008).

[23] 335 F.3d 684, 690 (8th Cir. 2003).

6

"substantial likelihood of success" test, there is a presumption that the implementation process of the Rule here is reasoned. The presumption can be overcome where the evidence establishes a fundamentally flawed process, demonstrating that the regulation is not the product of a reasoned democratic process.

1. *Use of Deliberative Memoranda*

Generally, courts should not consider "interagency or intra-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the agency" when reviewing agency rules.[24] The deliberative process exemption permits non-disclosure if "the document is both predecisional and deliberative."[25] The purpose of the deliberative process exemption is to avoid the harm that agency discussions are "chilled" by the disclosure and use of the agencies deliberative process memoranda and correspondence.[26] A document is predecisional if it "contains personal opinions and is designed to assist agency decision-makers in making their decision."[27] A document is deliberative if its disclosure or use would "expose the decision-making process in such a way that candid discussion within the agency would be discouraged, undermining the agency's ability to perform its functions."[28] Even so, a court may "inquir[e] into the mental processes of administrative decision-makers" if "it is 'the only way there can be effective judicial

---

[24] 5 U.S.C. § 552(b)(5).

[25] <u>Missouri Coalition for Enviornment Foundation v. U.S. Army Corps of Engineers</u>, 542 F.3d 1204, 1211 (8th Cir. 2008).

[26] <u>Id.</u> at 1210.

[27] <u>Id.</u> at 1211.

[28] <u>Id.</u>

review.'"[29]

The States repeatedly point the court's attention to two clearly pre-decisional and deliberative interagency memoranda.[30] Ordinarily the court would not rely on these documents in its <u>Dataphase</u> analysis, however, the footing of the case leaves no other effective way to exercise judicial review in a timely manner. At this point, the Rule's effective date looms, the administrative record has not been produced, and the States assert irreparable harm. The court has reviewed both the memoranda at issue, the Technical Support Document, and the Economic Analysis document, and finds that the memoranda's opinion is supported by the underlying documents at the court's disposal.[31]

While the court would prefer an opportunity to review the entire administrative record, rather than rely on a handful of documents and deliberative memoranda, it is impossible to obtain the record prior to the effective date of the Rule. Under these unique circumstances, including a review of the Army Corps of Engineer's memoranda, consideration of the documents in the record is "the only way there can be effective judicial review."[32]

As noted in the internal memoranda and confirmed by a close review of the Economic Analysis document and Technical Support Document, the Agencies' internal

---

[29] <u>Voyageurs Nat. Park Ass'n v. Norton</u>, 381 F.3d 759, 766 (8th Cir. 2004).

[30] Doc. #33, Exhs. A & P.

[31] In its reply brief, the States assert that since the memoranda are in the public record the Agencies have waived the deliberative process privilege. The court is unaware how these documents came to be in the public domain and no administrative record has been prepared for this proceeding. The court finds that waiver would be a decidedly unfair doctrine to apply to the Agencies and declines the invitation to find waiver under these circumstances.

[32] <u>See</u> <u>id.</u> (quoting <u>Citizens to Preserve Overton Park, Inc. v. Volpe</u>, 401 U.S. 402, 420 (1971)).

documents reflect the absence of any information about how the EPA obtained its presented results. Consequently, the subsequent results are completely unverifiable."[33] The court is placed in an even worse position than the internal reviewers to understand the process applied by the EPA because of a lack of access to the complete administrative record. Even so, a review of what has been made available reveals a process that is inexplicable, arbitrary, and devoid of a reasoned process. Under these circumstances, the applicable standard for likelihood of success on the merits is the "fair chance" standard. Regardless, it is worthy of note, that even if the court applied the higher "substantial likelihood of success" standard, its conclusions would be unchanged.

>    2. *Analysis of Likelihood of Success Factor*
>
>        a. EPA Violated Its Grant of Authority by Congress When It Promulgated the Rule.

The States are likely to succeed on the merits of their claim that the EPA has violated its grant of authority in its promulgation of the Rule. In <u>United States v. Bailey</u>[34], the Eighth Circuit Court of Appeals held that the EPA or Corps may assert Clean Water Act jurisdiction if the waters in question meet either the plurality's requirements or Justice Kennedy's concurring opinion in <u>Rapanos v. United States</u>.[35] Because the Agencies assert jurisdiction under Justice Kennedy's concurrence, the court's analysis will focuses on whether the Rule meets this criteria.

Justice Kennedy's analysis begins with 33 U.S.C. § 1251(a), requiring the court to be

---

[33] Doc. #33, Exh. P, ¶3.

[34] 571 F.3d 791, 799 (8th Cir. 2009).

[35] 547 U.S. 715 (2006).

cognizant that the purpose of the Clean Water Act is to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters."[36] In order to establish the requisite significant nexus, the Agencies must determine whether the waters in question do in fact affect the chemical, physical, and biological integrity of those waters.[37] Jurisdictional waters have the requisite nexus, if they "significantly affect the chemical, physical, and biological integrity of other covered waters more readily understood as 'navigable.'"[38] Waters fall outside the zone of "navigable waters" when the effect "on water quality [is] speculative or insubstantial."[39] In determining its jurisdiction over waters, an agency "may choose to identify categories of tributaries that, due to their volume of flow . . . , their proximity to navigable waters, or other relevant considerations, are significant enough that wetlands adjacent to them are likely in the majority of cases, to perform important functions for an aquatic system incorporating navigable waters."[40]

The Rule here likely fails to meet this standard. In Rapanos, the Corps defined a tributary as a water that "feeds into a traditional navigable water (or a tributary thereof) and possesses an ordinary high-water mark, defined as a line on the shore established by the fluctuations of water and indicated by [certain] physical characteristics."[41] Justice Kennedy noted that if it were applied consistently, "it may well provide a reasonable

---

[36] Rapanos v. United States, 547 U.S. 715, 779 (2006) (Kennedy, J., concurring).

[37] Id. at 780.

[38] Id.

[39] Id.

[40] Id.

[41] Id. at 781.

measure of whether specific minor tributaries bear a sufficient nexus with other regulated waters to constitute 'navigable waters' under the Act."[42] Justice Kennedy concurred in judgment finding that the breadth of the Corps standard in Raponos "seem[ed] to leave wide room for regulation of drains, ditches, and streams remote from any navigable-in-fact waters."[43]

The Rule at issue here suffers from the same fatal defect. The Rule allows EPA regulation of waters that do not bear any effect on the "chemical, physical, and biological integrity" of any navigable-in-fact water. While the Technical Support Document states that pollutants dumped into a tributary will flow downstream to a navigable water,[44] the breadth of the definition of a tributary set forth in the Rule allows for regulation of any area that has a trace amount of water so long as "the physical indicators of a bed and banks and an ordinary high water mark" exist.[45] This is precisely the concern Justice Kennedy had in Rapanos, and indeed the general definition of tributary is strikingly similar.[46] While the Agencies assert that the definitions exclusion of drains and ditches remedies the defect, the definition of a tributary here includes vast numbers of waters that are unlikely to have a nexus to navigable waters within any reasonable understanding of the term.[47] The States have established a fair chance of success on the merits of their claim that the Rule violates

---

[42] Id.

[43] Id.

[44] Doc. #66, Exhs. 2-10.

[45] 80 Fed. Reg. 37105.

[46] See Rapanos v. United States, 547 U.S. at 781.

[47] See id.

11

the congressional grant of authority to the EPA.

              b.      The Agencies Likely Failed to Comply with APA Requirements When Promulgating the Rule.

*i.      The Rule is Likely Arbitrary and Capricious*

The court must set aside a final agency rule if it finds the rule is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law."[48] The scope of this "standard is narrow and a court is not to substitute its judgment for that of the agency."[49] Nevertheless, the agency has a duty to "examine the relevant data and articulate a satisfactory explanation for its action."[50] An agency must base its explanation on a "rational connection between the facts found and the choice made."[51]

The States have a fair chance of success on the merits under this prong as well. The Agencies assert that any water that fits in the definition of a "tributary" will as of necessity "significantly affect the chemical, physical, and biological integrity of traditional navigable waters."[52] The Technical Support Document states that science demonstrates tributaries do in point of fact affect the integrity of traditional navigable waters.[53] Setting aside the issue as to whether the Technical Support Document conflates ephemeral streams with tributaries, the claims made by the Agencies appear to only apply to a subset within the

---

[48] 5 U.S.C. § 706(2)(A).

[49] Motor Vehicle Mfrs. Ass'n of United States, Inc. v. State Farm Mut. Ins. Co., 463 U.S. 29, 43 (1983).

[50] Id.

[51] Burlington Truck Lines v. United States, 371 U.S. 156, 168 (1962).

[52] 80 Fed. Reg. 37075.

[53] Corps and EPA, Tech. Support Document for the Clean Water Rule: Definition of Waters of the United States, 244-246 (May 27, 2015).

broad definition of the Rule. The Rule asserts jurisdiction over waters that are remote and intermittent waters. No evidence actually points to how these intermittent and remote wetlands have any nexus to a navigable-in-fact water. The standard of arbitrary and capricious is met because the Agencies have failed to establish a "rational connection between the facts found" and the Rule as it will be promulgated.[54]

The Rule also arbitrarily establishes the distances from a navigable water that are subject to regulation. The Army Corps of Engineers noted:

> The 4,000-feet limit arbitrarily cuts off which waters can be determined 'similarly situated' under [a significant nexus determination], as (a)(8) waters cannot be aggregated with other waters beyond 4,000 feet even if they are truly 'similarly situated,' further limiting the use of the 'key' factor under the final rule. The 4,000-foot limitation under (a)(8) conflicts with the TSD regarding the importance of connectivity.[55]

Once again, the court has reviewed all of the information available to it and is unable to determine the scientific basis for the 4,000 feet standard. Based on the evidence in the record, the distance from the high water mark bears no connection to the relevant scientific data purported to support this because any water that is 4,001 feet away from the high water mark cannot be considered "similarly situated" for purposes of 33 C.F.R. § 328.3(a)(8). While a "bright line" test is not in itself arbitrary, the Rule must be supported by some evidence why a 4,000 foot standard is scientifically supportable. On the record before the court, it appears that the standard is the right standard because the Agencies say it is. Under these circumstances the Rule setting the 4,000 feet standard is likely arbitrary

---

[54] See Burlington Truck Lines, 371 U.S. at 168.

[55] Army Corps of Engineers, Memorandum for Deputy Commanding General for Civil and Emergency Operations: Economic Analysis and Technical Support Document Concerning the Draft Final Rule on Definition of "Waters of the United States, ¶ 17 (May 15, 2015).

and capricious.

## ii. *The Rule is Not Likely a "Logical Outgrowth" of the Proposed Rule*

Title 5, of the United States Code, § 553(b) requires that an agency publish proposed rulemakings in the Federal Register including "either the terms or substance of the proposed rule or a description of the subjects and issues involved." The statute further requires the agency to provide "interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments."[56] The publication of notice of the proposed rule "need not contain every precise proposal which (the agency) may ultimately adopt as a rule."[57] Nevertheless, the final rule must be a "logical outgrowth" of the proposed rule.[58] In determining whether a final rule is a "logical outgrowth," the court should determine whether the interested parties "should have anticipated that such a requirement might be imposed."[59]

The definition of "neighboring" under the final rule is not likely a logical outgrowth of its definition in the proposed rule. The final rule greatly expanded the definition of "neighboring" such that an interested person would not recognize the promulgated Rule as a logical outgrowth of the proposed rule. The proposed rule defined waters of the United States as "includ[ing] waters located within the riparian area or floodplain of a water

---

[56] 5 U.S.C. § 553(c).

[57] Northwest Airlines, Inc. v. Goldschmidt, 645 F.2d 1309, 1319 (8th Cir. 1981).

[58] Long Island Care at Home, Ltd. v. Coke, 551 U.S. 158, 174 (2007).

[59] Small Refiner Lead Phase-Down Task Force v. U.S.E.P.A., 705 F.2d 506, 549 (D.C. Cir. 1983); see also Chocolate Mfrs. Ass'n of U.S. v. Block, 755 F.2d 1098, 1104 (4th Cir. 1985) ("[I]f the final rule materially alters the issues involved in the rulemaking or, as stated in Rowell v. Andrus, 631 F.2d 699, 702 n.2 (10th Cir. 1980), if the final rule 'substantially departs from the terms or substance of the proposed rule,' the notice is inadequate.").

identified in paragraphs (a)(1) through (5) of this section, or waters with a shallow subsurface hydrological connection or confined surface hydrological connection to such a jurisdictional water."[60] When the Agencies published the final rule, they materially altered the Rule by substituting the ecological and hydrological concepts with geographical distances that are different in degree and kind and wholly removed from the original concepts announced in the proposed rule. Nothing in the call for comment would have given notice to an interested person that the rule could transmogrify from an ecologically and hydrologically based rule to one that finds itself based in geographic distance.

    iii.    *The Alleged NEPA Violation.*

The States have asserted that the Agencies have violated NEPA by failing to provide an Environmental Impact Statement. This court is unpersuaded by the Agencies' argument that they have not failed to comply with NEPA, mainly because it is hamstrung by the lack of the administrative record. It is unnecessary to reach this issue because the States have already established that they will likely succeed on the merits of their other claims.

### B. Irreparable Harm

To succeed on a motion for a preliminary injunction, the moving party must show that irreparable harm will result absent the injunction.[61] "In order to demonstrate irreparable harm, a party must show that the harm is certain and great and of such imminence that there is a clear and present need for equitable relief."[62]

The States here have demonstrated that they will face irreparable harm in the

---

[60] 79 Fed. Reg. 22264.

[61] Id. at 112.

[62] Iowa Utilities Bd. v. F.C.C., 109 F.3d 418 (8th Cir. 1996).

15

absence of a preliminary injunction. It is within the purview of the traditional powers of the States to maintain their "traditional and primary power over land and water use."[63] Once the Rule takes effect, the States will lose their sovereignty over intrastate waters that will then be subject to the scope of the Clean Water Act.[64] While the exact amount of land that would be subject to the increase is hotly disputed, the Agencies admit to an increase in control over those traditional state-regulated waters of between 2.84 to 4.65 percent.[65] Immediately upon the Rule taking effect, the Rule will irreparably diminish the States' power over their waters.

In addition to the loss of sovereignty, the States assert an irreparable harm in the form of unrecoverable monetary harm. It is undeniable that if the States incur monetary losses as a result of an unlawful exercise of regulatory authority, no avenue exists to recoup those losses as the United States has not waived sovereign immunity from suits seeking these sorts of damages.

The analysis thus turns to whether or not the States can show that the Rule subjects them to unrecoverable monetary harm. The States assert numerous losses that would be attributable to the Rule. For example, the Rule will make North Dakota subject to, among other things, undertaking jurisdictional studies for every proposed natural gas, oil, or water

---

[63] See Solid Waste Agency of Northern Cook County (SWANCC) v. U.S. Army Corps of Engineers, 531 U.S. 159 (2001) (citing Hess v. Port Authority Trans-Hudson Corporation, 513 U.S. 30, 44 (1994) ("[R]egulation of land use [is] a function traditionally performed by local governments").

[64] See e.g., 80 Fed. Reg. 37105, Part 328(a)(6) (expanding qualifying adjacent waters as previously defined in 33 C.F.R. § 328.3(a)(6) as merely adjacent wetlands to the new Rule at 33 C.F.R. § 328.3(a)(6) to "[a]ll waters adjacent").

[65] 80 Fed. Reg. 37101.

pipeline project.⁶⁶ This will incur both direct losses, including vast expenditures to map and survey large portions of the state, and indirect losses such as lost tax revenue while projects are stalled pending mapping. Wyoming also asserts that it will be required to bear the costs of the additional Clean Water Act § 401 certifications, including expansion of permitting, oversight, technical and legal analysis for reclamation and development projects.⁶⁷ These losses are unrecoverable economic losses because there is neither an alternative source to replace the lost revenues nor a way to avoid the increased expenses. The States will suffer irreparable harm in the absence of a preliminary injunction.

### C. *Balance of the Harms* and *Effect on the Public Interest*

In exercising its power to grant a preliminary injunction, the court must balance the harms to the parties to the litigation while "pay[ing] particular regard for the public consequences."⁶⁸ For the court to grant an injunction, the moving party must establish that the entry of the relief would serve public interest.⁶⁹

On balance, the harms favor the States. The risk of irreparable harm to the States is both imminent and likely. More importantly delaying the Rule will cause the Agencies no appreciable harm. Delaying implementation to allow a full and final resolution on the merits is in the best interests of the public.

The court acknowledges that implementation of the Rule will provide a benefit to an important public interest, both in providing some protection to the waters of the United

---

⁶⁶ Doc. #33, Exh. D, ¶¶ 19-21.

⁶⁷ Doc. 33, Exh. H, ¶¶ 10-14

⁶⁸ Winter v. Natural Resources Defense Council, Inc., 555 U.S. 7, 24 (2008).

⁶⁹ Dataphase, 640 F.2d at 113.

States and because it would provide increased certainty as to what constitutes jurisdictional waters as some people will be categorically removed from the definition of waters of the United States (for example owners of an intermittent wetland 4,001 feet away from an established tributary). The benefit of that increased certainty would extend to a finite and relatively small percentage of the public. A far broader segment of the public would benefit from the preliminary injunction because it would ensure that federal agencies do not extend their power beyond the express delegation from Congress.[70] A balancing of the harms and analysis of the public interest reveals that the risk of harm to the States is great and the burden on the Agencies is slight. On the whole, the greater public interest favors issuance of the preliminary injunction.

## IV. DECISION

The States have established that the Dataphase factors weigh in favor of injunctive relief. Their motion for a preliminary injunction, enjoining Fed. Reg. 37,054-127, jointly promulgated by the U.S. Environmental Protection Agency and U.S. Army Corps of Engineers, is **GRANTED**.

**IT IS SO ORDERED.**

Dated this 27th day of August, 2015.

                                                           */s/ Ralph R. Erickson*
                                                           Ralph R. Erickson, Chief District Judge
                                                           District of North Dakota

---

[70] First Premier Bank v. U.S. Consumer Fin. Prot. Bureau, 819 F. Supp. 2d 906, 922 (D.S.D. 2011).