## UNITED STATES DISTRICT COURT
## DISTRICT OF NORTH DAKOTA
## SOUTHEASTERN DIVISION

| | |
|---|---|
| NORTH DAKOTA, et al., | Case No. 3:15-cv-00059-DLH-ARS |
| Plaintiffs, | |
| v. | **COMPLAINT**<br>**IN INTERVENTION** |
| UNITED STATES ENVIRONMENTAL PROTECTION AGENCY; ANDREW WHEELER, in his official capacity as Administrator of the U.S. Environmental Protection Agency; UNITED STATES ARMY CORPS OF ENGINEERS; and R.D. JAMES, in his official capacity as Assistant Secretary for Civil Works, Department of the Army, | |
| Defendants. | |

Plaintiff-Intervenor Coalition of Arizona/New Mexico Counties for Stable Economic Growth, through counsel, alleges the following.

1.      This is a civil action for declaratory and injunctive relief brought against the U.S. Environmental Protection Agency ("EPA") and the U.S. Army Corps of Engineers ("Army") (collectively "Agencies") under the Administrative Procedure Act, 5 U.S.C. §§ 701 *et seq.*

2.      This case involves a challenge to a final rule promulgated by the Agencies under the Federal Water Pollution Control Act, 33 U.S.C. §§ 1251, *et seq.* ("Clean Water

- 1 -

Act"). The rule, entitled "Definition of 'Waters of the United States' Under the Clean Water Act." 80 Fed. Reg. 37,054–37,127 (June 29, 2015) ("Final Rule"), unlawfully expands the Agencies' jurisdiction over state land and water resources beyond the limits established by Congress under the Clean Water Act. Plaintiff-Intervenor therefore seeks declaratory and injunctive relief against the Agencies for violations of the Administrative Procedure Act, the Clean Water Act, the National Environmental Policy Act, 42 U.S.C. §§ 4321, *et seq.*, Article I, § 8, of the United States Constitution ("Commerce Clause"), and the Tenth Amendment to the United States Constitution. Federal courts have enjoined the Final Rule in roughly half of the country, including in New Mexico.

## JURISDICTION AND VENUE

3.      Jurisdiction is founded upon 28 U.S.C. § 1331 (federal question); § 1346(a)(2) (civil action against the United States); § 2201 (authorizing declaratory relief); § 2202 (authorizing injunctive relief and any other "necessary and proper" relief); and 5 U.S.C. § 702 (judicial review of agency action under the Administrative Procedure Act). This case is not subject to direct judicial review in the Circuit Court of Appeals under 33 U.S.C. § 1369(b). *Nat'l Ass'n of Mfrs. v. Dep't of Def.*, 138 S. Ct. 617 (2018).

4.      This action is timely. 28 U.S.C. § 2401(a).

5.      The challenged rules are final agency actions, ripe for judicial review. 5 U.S.C. § 704.

6.      Venue is proper under 28 U.S.C. § 1391(e) because North Dakota resides in this judicial district.

## PARTIES

### PLAINTIFFS

7.      Plaintiffs—twelve states and two agencies of a thirteenth state—initially challenged the Final Rule arguing that the Rule drastically alters the administration of water quality programs implemented by states and the Agencies, and unlawfully expands the Agencies' jurisdiction over state land and water resources beyond the limits established by Congress under the Clean Water Act. An additional state—Iowa—subsequently intervened in the action bringing the total states to fourteen.

8.      After the 2018 election, several of the states that were party to the initial lawsuit have announced their intention to withdraw from the lawsuit. New Mexico is one of those states.

### INTERVENOR

9.      Plaintiff-Intervenor is the Coalition of Arizona and New Mexico Counties for Stable Economic Growth which is a nonpartisan, nonprofit organization that represents four counties in Arizona (Cochise, Gila, Graham, and Greenlee) and 10 counties in New Mexico (Catron, Chaves, Eddy, Harding, Hidalgo, Lincoln, McKinley, Sierra, Rio Arriba, and Roosevelt).

10.      The New Mexico counties are considered political subdivisions of the state and are "constituted to administer state power and authority". *Einer v. Rivera*, 346 P.3d 1197, 1203 (N.M. Ct. App. 2015).

11.      Counties in New Mexico are given broad authority to enact ordinances "necessary and proper to provide for the safety, preserve the health, promote the prosperity

and improve the morals, order, comfort and convenience of any county or its inhabitants." *Bd. of Comm'rs of Rio Arriba Cty. v. Greacen*, 3 P.3d 672, 675 (N.M. 2000).

12.     Plaintiff-Intervenor works with the state to implement policies regulating land use, water quality, and water resources within their jurisdiction.

## DEFENDANTS

13.     The United States Environmental Protection Agency is a cabinet agency and has enforcement responsibility for portions of the Clean Water Act affected by the Final Rule. The EPA jointly issued the regulations challenged in this action.

14.     Andrew Wheeler is the Administrator of the EPA. His predecessor Gina McCarthy signed the Final Rule on behalf of EPA on June 29, 2015.

15.     The United States Army Corps of Engineers is a branch of the Department of the Army and has enforcement responsibility for portions of the Clean Water Act affected by the Final Rule. The Army jointly issued the regulations challenged in this action.

16.     R.D. James is the Assistant Secretary of the Army for Civil Works. His predecessor Jo-Ellen Darcy signed the Final Rule on behalf of the Army on June 29, 2015.

## LEGAL BACKGROUND

17.     For over a hundred years, the United States Congress regulated the obstruction of navigation on rivers and lakes through a series of statutes that applied to "navigable waters of the United States." *Rapanos v. United States*, 547 U.S. 715, 723 (2006). In a line of cases originating with *The Daniel Ball*, the Supreme Court of the United States interpreted this term to refer to

> [t]hose rivers . . . which are navigable in fact[, *i.e.*] . . . when they are used, or are susceptible of being used, in their ordinary condition, as highways for commerce over which trade and travel are or may be conducted in the customary modes of travel on water. And they constitute navigable waters of the United States within the meaning of the acts of Congress, in contradistinction from the navigable waters of the States, when they form in their ordinary condition by themselves, or by uniting with other waters, a continued highway over which commerce is or may be carried on with other States or foreign countries in the customary modes in which such commerce is conducted by water.

77 U.S. 557, 563 (1870); *see also Rapanos*, 547 U.S. at 723. Federal courts can take judicial notice of whether or not a given river or lake is navigable-in-fact, although the precise portions of it that are navigable may require consideration of evidence. *United States v. Rio Grande Dam & Irrigation Co.*, 174 U.S. 690, 698 (1899).

18.     The phrase "navigable waters of the United States" was used in Section 10 of the Rivers and Harbors Act when that act was first adopted in 1899, Mar. 3, 1899, c. 425, § 10, 30 Stat. 1151, and remains in use today, 33 U.S.C. § 403. Section 10 also prohibits obstructions to "the navigable capacity of the waters of the United States" unless authorized by Congress. 33 U.S.C. § 403.

**THE CLEAN WATER ACT**

19.     In 1972, Congress adopted significant amendments. The Clean Water Act prohibits unpermitted discharges, defined as additions of pollutants from point sources to navigable waters. 33 U.S.C. §§ 1311(a), 1362(12). The Clean Water Act assigns general permitting authority to the EPA, with specific permitting authority assigned to the Army to permit discharges of dredged or fill material. 33 U.S.C. §§ 1342(a)(1), 1344(a). So, the meaning of the term "navigable waters" is what determines whether any particular action

is prohibited and/or subject to permitting by the Clean Water Act. The Clean Water Act defines "navigable waters" to "mean[] the waters of the United States, including the territorial seas." 33 U.S.C. § 1362(7).

20.     The Clean Water Act's words "navigable waters" and "waters of the United States, including the territorial seas" are very close to the predecessor statutes' words "navigable waters of the United States" and the expression "navigable capacity of the waters of the United States" in Section 10 of the Rivers and Harbors Clean Water Act. This evinces a congressional intent that the terms be interpreted in a closely related way. The only significant variation in the terms is the Clean Water Act's introduction of the term "the territorial seas." This indicates that the Clean Water Act applies to navigable-in-fact waters as defined in *The Daniel Ball* and referenced in Section 10 of the Rivers and Harbors Clean Water Act, and *downstream* waters to and including the territorial seas.

21.     Nothing in the Clean Water Act's definition of "navigable waters" extends the term to non-navigable waters of any sort (*e.g.*, tributaries and "adjacent waters") that are upstream of or isolated from navigable-in-fact waters. Nothing in the legislative history of the Clean Water Act shows that Congress "intended to exert anything more than its commerce power over navigation." *Solid Waste Agency of N. Cook Cty. v. Army Corps of Eng'rs*, 531 U.S. 159, 168 n.3 (2001) (*SWANCC*). In contrast, when Congress has intended to extend its reach to waters that are not navigable, it has said so expressly. For instance, with the Flood Control Act of 1936, Congress claimed authority over "navigable waters or their tributaries, including watersheds thereof." 33 U.S.C. § 701(a); 49 Stat. 1570.

22.     To the extent that "navigable waters" under the Clean Water Act were to be interpreted to include any non-navigable waters upstream of navigable-in-fact waters, the Clean Water Act provides no intelligible principle for determining which non-navigable waters are included.

23.     Congress directed that States should retain their sovereign authority over state land and water resources, instructing the Agencies to "recognize, preserve, and protect the primary responsibilities and rights of States . . . to plan the development and use . . . of land and water resources . . . ." *Id*. § 1251(b).

24.     The Clean Water Act requires anyone seeking to discharge certain material into "waters of the United States" to obtain a permit from either a state or EPA, in the case of pollutants, or a state or the Army, in the case of dredged or fill material. *Id*. §§ 1311(a), 1342(a), 1344(a), 1362(12).

25.     In most cases, states are the primary administrators of the National Pollutant Discharge Elimination System permitting program under 33 U.S.C. § 1342. *See* EPA, *Specific State Program Status*, *available at* http://water.epa.gov/polwaste/npdes/basics/upload/State_ NPDES_Prog_Auth.pdf (last visited June 28, 2015). States also have the authority to assume the dredge and fill discharge permitting program under 33 U.S.C. § 1344(g). Plaintiff-Intervenor's members must obtain and comply with the requirements of these NPDES permits.

26.     States must establish Water Quality Standards for each water body meeting the definition of "waters of the United States." 33 U.S.C. § 1313. Those standards must be

periodically reviewed and updated. *Id.* § 1313(c). Plaintiff-Intervenor's members provide input to states in establishing these standards.

27.     For waters that fail to meet applicable Water Quality Standards, a state must set Total Maximum Daily Loads limiting the amount of pollutants that can be discharged into such waters in order to meet the established standards. 40 C.F.R. § 130.7. States must implement Total Maximum Daily Loads through water quality management plans and permitting programs. *Id.* Plaintiff-Intervenor's members frequently must comply with permitting that is driven by these state developed standards.

28.     States are also required to issue certifications for all federally issued permits to ensure that the proposed discharges comply with state Water Quality Standards. 33 U.S.C. § 1341(a)(1). Plaintiff-Intervenor's members must obtain permits for projects that are covered by the Clean Water Act.

## NATIONAL ENVIRONMENTAL POLICY ACT

29.     The National Environmental Policy Act requires federal agencies to prepare a detailed Environmental Impact Statement for all "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C).

30.     An agency may prepare an initial Environmental Assessment to determine whether a federal action qualifies as "major" and therefore must be supported by an Environmental Impact Statement. In the alternative, the Environmental Assessment may conclude that the action qualifies for a Finding of No Significant Impact. 40 C.F.R. § 1508.9.

31.     A Finding of No Significant Impact is only appropriate if the proposed action will have no significant impact on the human environment. *Id*. § 1508.13. If there are questions as to the significance of effects associated with the proposed action, an Environmental Impact Statement is required.

32.     Significance may be determined using one of ten "intensity" factors. *Id*. § 1508.27(b). Those factors include, *inter alia*, the degree to which the effects are "highly controversial" or "uncertain;" the degree to which the "action may establish a precedent for future actions with significant effects or represents a decision in principle about a future consideration;" and whether the action threatens a violation of federal law. *Id*.

33.     The National Environmental Policy Act also requires federal agencies to take a "hard look" at the proposed action's consequences and consider a reasonable range of alternatives to the proposed action. *Friends of Boundary Waters Wilderness v. Dombeck*, 164 F.3d 1115, 1128 (8th Cir. 1999).

## FACTUAL BACKGROUND

### Early Agency Regulations and Riverside Bayview Homes

34.     In 1974 the Army adopted regulations defining "navigable waters" under the Clean Water Act to implement its permitting authority, consistent with the historic definition adopted in *The Daniel Ball*. 39 Fed. Reg. 12,119 (Apr. 3, 1974); *Rapanos*, 547 U.S. at 723; *SWANCC*, 531 U.S. at 169. The U.S. District Court for the District of the District of Columbia ruled that these regulations were inadequate in *Natural Resources Defense Council, Inc. v. Callaway*, 392 F. Supp. 685, 686 (D.D.C. 1975). The Army was

subsequently unable to identify any "persuasive evidence that [it] mistook Congress' intent in 1974." *SWANCC*, 531 U.S. at 168.

35. But instead of appealing the trial court ruling, the Army adopted new and significantly broader regulations in 1975, 1977, and 1982. These regulations added the regulation of wetlands as "navigable waters" for the first time. *See generally, United States v. Riverside Bayview Homes, Inc*., 474 U.S. 121, 123–24 (1985).

36. In 1985 the Supreme Court decided *Riverside Bayview Homes*, which holds that the Army regulations then in-effect reasonably interpreted "navigable waters" to include a non-navigable wetland adjacent to a navigable-in-fact lake. 474 U.S. at 135. The Supreme Court did not consider, in *Riverside Bayview Homes*, whether "navigable waters" included wetlands that were not actually adjacent to navigable-in-fact waters. *Id*. at 124 n.2; *id*. at 131 n.8.

## THE 1986 REGULATIONS

37. In 1986, EPA and the Army jointly adopted new and coordinated regulations defining "navigable waters" to include:

• All navigable-in-fact waters, plus all waters which are, were, or reasonably could be used more generally in interstate commerce (33 C.F.R. § 328.3(a)(1) (1987))[1];

• The territorial seas (33 C.F.R. § 328.3(a)(6) (1987));

• All interstate waters including interstate wetlands ("Interstate Waters") (33 C.F.R. § 328.3(a)(2) (1987));

---

[1] For ease of reference, the Army's regulations are cited throughout. From the 1986 Regulations forward, both EPA and the Army's regulations are identical in relevant part.

•      All intrastate waters (whether navigable or not) that met various criteria ("Covered Intrastate Waters") (33 C.F.R. § 328.3(a)(3) (1987));

•      All non-navigable tributaries to navigable-in-fact waters, Interstate and Covered Intrastate Waters, and Impoundments ("Non-navigable Tributaries") (33 C.F.R. § 328.3(a)(5) (1987));

•      Wetlands adjacent to (meaning "bordering, contiguous, or neighboring") the territorial seas, navigable-in-fact waters, Interstate and Covered Intrastate Waters, and their Non-navigable Tributaries ("Adjacent Wetlands") (33 C.F.R. §§ 328.3(a)(7), 328.3(c) (1987)); and

•      All impoundments of all other waters covered by the definition ("Impoundments") (33 C.F.R. § 328.3(a)(4) (1987)).

38.      33 C.F.R. § 328.3(a) (1987); 51 Fed. Reg. 41,206, 41,250–51 (Nov. 13, 1986) (the "1986 Regulations").

39.      When it adopted the 1986 Regulations, the Army also adopted EPA's prior position that "navigable waters" included all waters (1) used to irrigate crops sold in interstate commerce, (2) served as habitat for birds protected by the Migratory Bird Treaty Act, (3) served as habitat for endangered species, or (4) "which are or would be used as habitat by migratory birds which cross state lines." 51 Fed. Reg. 41,217 (Nov. 13, 1986). The last of these provisions was known as the Migratory Bird Rule.

## *SWANCC* AND *RAPANOS*

40.     The 1986 Regulations were the subject of two subsequent adverse Supreme Court decisions. In *SWANCC*, the Supreme Court invalidated the Migratory Bird Rule as beyond the scope of "navigable waters" under the Clean Water Act. *SWANCC* narrowed *Riverside Bayview Homes* by emphasizing that the word "navigable" in the text of the Clean Water Act demonstrates that Congress' intent was focused on its "traditional jurisdiction over waters that were . . . navigable in fact." 531 U.S. at 172. In *SWANCC* the Court further emphasized the dual purposes of the Clean Water Act, with federalism and local control of land use and water allocation equal to the federal policy of water quality protection, and that the Clean Water Act lacks the necessary "clear statement" to indicate any congressional intent to interfere in traditionally local functions. *Id*. at 172–74. *SWANCC* also posits that the Army's original 1974 regulations defining "navigable waters" consistent with the meaning set forth in *The Daniel Ball* may have been correct. 531 U.S. at 168; *id*. at 168 n.3.

41.     Then in a fractured opinion in *Rapanos*, the Supreme Court invalidated the Non-navigable Tributary and Adjacent Wetlands provisions of the 1986 Regulations, also as beyond the scope of the statutory term "navigable waters."

42.     The issue in *Rapanos* was how to interpret the Clean Water Act's term "navigable waters" in the context of non-navigable tributaries to navigable-in-fact waterways, and wetlands that do not physically abut navigable-in-fact waterways. 547 U.S. at 728; *id*. at 759 (Kennedy, J., concurring). The judgment of the Court in *Rapanos* was to remand the case because the lower courts had not properly interpreted that term. *Id*. at 757.

The five Justices who supported the judgment arrived at it by two different interpretations of the term navigable waters.

43.    The plurality determined that the language, structure, and purpose of the Clean Water Act all limited federal authority to "relatively permanent, standing or continuously flowing bodies of water" commonly recognized as "streams, oceans, rivers and lakes" connected to traditional navigable waters. 547 U.S. at 739. The plurality also authorized federal regulation of wetlands physically abutting these water bodies, such that they have an immediate surface water connection where the wetland and water body are "indistinguishable." *Id*. at 755.

44.    Justice Kennedy joined the plurality in the judgment. But he proposed a broader interpretation of "navigable waters" than the plurality: the "significant nexus" test. *Id*. at 759 (Kennedy, J., concurring). Under this view, the federal government could regulate a non-abutting wetland if it significantly affects the physical, chemical, and biological integrity of a navigable-in-fact waterway. *Id*. at 779 (Kennedy, J., concurring).

45.    The plurality and Justice Kennedy did agree on the following: that the issue in *Rapanos* was how to interpret the term "navigable waters" in the Clean Water Act; *id*. at 728; *id*. at 760 (Kennedy, J., concurring); that the Court's prior decisions in *Riverside Bayview Homes* and *SWANCC* provided the controlling law, *Rapanos*, 547 U.S. at 734–35; *id*. at 767 (Kennedy, J., concurring); and that wetlands that physically abut navigable waters are "adjacent," *id*. at 742; *id*. at 759, 766 (Kennedy, J., concurring) (*Riverside Bayview* did not address non-adjacent wetlands), and are categorically also "navigable waters" under the Clean Water Act. *Id*. at 742; *id*. at 780 (Kennedy, J.,

concurring). The key point of departure between them was the plurality's narrow reading of the term "significant nexus" (as describing only the type of physical intermingling that in *Riverside Bayview* prevented a clear distinction between the waters and the wetlands) and Justice Kennedy's broad reading of it (as categorically encompassing *Riverside Bayview*-type wetlands, in accord with the plurality, and including others on a case-by-case basis, with which the plurality disagreed). *Compare* 547 U.S. at 754–55 (disagreement with Kennedy's broad reading of "significant nexus") *with id*. at 774 (Kennedy, J., concurring) (*Riverside Bayview* and *SWANCC* do not limit jurisdictional wetlands to those physically abutting jurisdictional tributaries).

## THE FINAL RULE DEFINITION

46.    In 2015, EPA and the Army adopted the Final Rule purporting to define the Clean Water Act's term "navigable waters." 33 C.F.R. § 328.3 (2016); 80 Fed. Reg. 37,054 (June 29, 2015). The Final Rule superseded the 1986 Regulations and any guidance interpreting the 1986 Regulations.

47.    On April 21, 2014, the Agencies published in the Federal Register a proposed rule entitled "Definition of 'Waters of the United States' Under the Clean Water Act." 79 Fed. Reg. 22,188–22,274 (Apr. 21, 2014) ("Proposed Rule").

48.    The Agencies published the Final Rule in the Federal Register on June 29, 2015. *See* 80 Fed. Reg. 37,054–37,127 (June 29, 2015).

49.    The Army released its Final Environmental Assessment and Finding of No Significant Impact on May 26, 2015, declaring the Final Rule not significant within the meaning of the National Environmental Policy Act and therefore not subject to the

Environmental Impact Statement requirement. Army, *Finding of No Significant Impact, Adoption of the Clean Water Rule: Definition of Waters of the United States*, at 2 (May 26, 2015). The Army did not make the Draft Environmental Assessment or Finding of No Significant Impact available to the public or the States during the public comment period on the Proposed Rule.

50.    33 C.F.R. § 328.3(a) of the Final Rule defines "navigable waters" to include:

(1)    Navigable-in-fact waters, plus all waters which are, were, or reasonably could be used more generally in interstate commerce;

(2)    All interstate waters, including interstate wetlands;

(3)    The territorial seas;

(4)    All impoundments of other included waters;

(5)    All tributaries of navigable-in-fact and interstate waters and the territorial seas ("(a)(1)-(3) Waters");

(6)    All waters adjacent to navigable-in-fact and interstate waters, the territorial seas, impoundments, and tributaries ("(a)(1)-(5) Waters");

(7)    Certain types of wetlands, ponds, and bays occurring in different regions of the country, as determined on a case-by-case basis to have a significant nexus to (a)(1)-(3) Waters; and,

(8)    Certain waters within the 100-year floodplain of (a)(1)-(3) Waters, and certain additional waters within 4,000 feet of (a)(1)-(5) Waters, as determined on a case-by-case basis to have a significant nexus to (a)(1)-(3) Waters.

51.     33 C.F.R. § 328.3(c)(1) of the Final Rule defines "adjacent" as bordering, contiguous, or neighboring (a)(1)-(5) Waters.

52.     33 C.F.R. § 328.3(c)(2) of the Final Rule defines "neighboring" as within 100 feet of the ordinary high water mark of an (a)(1)-(5) Water, within the 100-year floodplain and within 1,500 feet of the ordinary high water mark of (a)(1)-(5) Waters, or within 1,500 feet of (a)(1)-(3) Waters including the Great Lakes.

53.     33 C.F.R. § 328.3(c)(3) of the Final Rule defines "tributary" as a water with a bed and bank and an ordinary high water mark, that contributes flow to (a)(1)-(3) Waters.

54.     33 C.F.R. § 328.3(c)(5) defines "significant nexus" based on nine factors, most of which are ecological factors unrelated to navigation.

55.     Numerous substantive comments were submitted to EPA and the Army during the public comment period of the rulemaking for the Final Rule. Many of these comments objected to the inclusion of interstate waters, intrastate waters that are not navigable-in-fact, and the regulation of all non-navigable tributaries and all adjacent wetlands and other waters.

56.     EPA and the Army adopted certain provisions of the Final Rule without notice and an opportunity to comment in violation of the Administrative Procedures Act, including the definition of "neighboring" in Section 328.3(c)(2), the inclusion of certain types of wetlands under Section 328.3(a)(7), the inclusion of waters within 4,000 feet of (a)(1)-(5) Waters on a case-by-case basis in Section 328.3(a)(8), and the catalog of factors for determining significant nexus in Section 328.3(c)(5)

57.     The Final Rule will harm Plaintiff-Intervenor's members in their capacity as owners and regulators of the waters and lands within their respective boundaries. Plaintiff-Intervenor's members' use and management of the waters and lands they own or regulate will be subject to greater federal regulation under the Final Rule.

58.     The Final Rule has an immediate and significant effect on the States' administration of their respective Water Quality Standard development and monitoring programs. *See id*. § 1313. The scope of waters subject to standard development, monitoring, and reporting will significantly increase as a result of the Final Rule, requiring the expenditure and commitment of additional state resources.

59.     The Final Rule has an immediate and significant effect on the States' administration of the National Pollutant Discharge Elimination System permitting program. *See id.* § 1342. The States with delegated program authority will receive additional National Pollutant Discharge Elimination System permit applications for discharging pollutants into waters now federally regulated as a result of the Final Rule, requiring the expenditure and commitment of additional state resources.

60.     The Final Rule has an immediate and significant effect on the States' administration of the Section 401 certification program. *See id*. § 1341. The States will receive additional Water Quality Standard certification requests for federally issued permits, including those under the Section 404 dredge and fill program, requiring the expenditure and commitment of additional state resources.

61.     Despite the immediate and significant effects on state sovereign authority, the Agencies failed to meaningfully consult with the States during the development of the

Proposed and Final Rule in violation of Executive Order 13,132 (Aug. 4, 1999). The failure

to consult also violated cooperative federalism principles enshrined in the Clean Water Act.

*See* 33 U.S.C. § 1251(b) ("It is the policy of the Congress to . . . protect the rights of States

. . . to consult with the Administrator in the exercise of [her] authority under" the Clean

Water Act.).

62.    All of the impacts of the Final Rule on the State of New Mexico will have

resulting impacts on Plaintiff-Intervenor's members as they are required to obtain permits

under the Clean Water Act.

## DECLARATORY RELIEF ALLEGATIONS

63.    The preceding paragraphs are incorporated herein.

64.    The validity of the Final Rule, is the subject of a live controversy. Plaintiff-

Intervenor contends the Final Rule changes and broadens the substantive standards for

determining jurisdictional waters under the Clean Water Act in violation of statutory and

constitutional authority. Defendants claim the Final Rule merely "clarifies" existing

standards and is consistent with these authorities.

65.    No factual development is necessary to resolve this case as Plaintiff-

Intervenor raises a pure legal challenge to the Final Rule on its face.

66.     Plaintiff-Intervenor is injured by the Final Rule because its members hold

beneficial interest in property that is or will be subject to increased federal regulatory

authority under the various regulations changed and illegal standards for determining

jurisdiction. This will require Plaintiff-Intervenor's members to seek federal permit

approval (at significant cost) to use their property for its intended purpose. Or, it will

require Plaintiff-Intervenor's members to seek a determination from the Army or a private party expert whether the Final Rule applies to them. *See Hawkes*, 782 F.3d at 1003 (Kelly, J., concurring) ("This is a unique aspect of the Clean Water Act; most laws do not require the hiring of expert consultants to determine if they even apply to you or your property."), *aff'd*, 136 S. Ct. 1807 (2016).

67.     Accordingly, an actual and substantial controversy exists between Plaintiff-Intervenor and the Agencies as to the parties' respective legal rights and responsibilities. A judicial determination of the parties' rights and responsibilities arising from this actual controversy is necessary and appropriate at this time.

## INJUNCTIVE RELIEF ALLEGATIONS

68.     The preceding paragraphs are incorporated herein.

69.     The Final Rule is currently enjoined in New Mexico as a result of this Court's ruling. *North Dakota v. EPA*, 127 F. Supp. 3d 1047, 1060 (D.N.D. 2015). However, Plaintiff-Intervenor fears that as a result of New Mexico's withdrawal from the lawsuit that this court will dissolve the injunction against enforcement of the Final Rule in New Mexico.

70.     Accordingly, while Plaintiff-Intervenor does not seek additional injunctive relief at this time, Plaintiff-Intervenor requests that this Court keep in place the existing injunction.

**FIRST CLAIM FOR RELIEF**

**The Final Rule Exceeds the Agencies' Authority under the Clean Water Act**

71.    The preceding paragraphs are incorporated herein.

72.    The Administrative Procedure Act requires an agency action to be set aside if it exceeds statutory authority or is found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A), (C).

73.    Under the Clean Water Act, the Army and EPA may regulate "navigable waters." 33 U.S.C. §§ 1342(a)(1), 1344(a), 1362(7).

74.    The Final Rule defines "waters of the United States" in a way that exceeds the Agencies' statutory authority by asserting, *inter alia*, that: (1) all waters that fall within the Rule's definition of "tributary" are per se jurisdictional; (2) all waters that fall within the Rule's definition of "adjacent waters" are per se jurisdictional; (3) purely intrastate waters and related features can fall within the Agencies' jurisdictional authority based solely on their relationship with non-navigable interstate waters; and (4) waters alone or in combination with "similarly situated waters" that have a "significant nexus" to a primary water or significantly affect the chemical, physical, or biological integrity of a primary water are within the Agencies' jurisdictional authority,' including "isolated waters."

75.    Expanding the scope of the Clean Water Act to cover these categories of waters exceeds the scope of the Clean Water Act as established by the Supreme Court in *Rapanos*, 547 U.S. at 725.

76.     The Final Rule must be set aside because it exceeds the Agencies' statutory authority under the Clean Water Act and is arbitrary and capricious, and contrary to law, in violation of the Administrative Procedure Act. *See* 5 U.S.C. § 706(2)(A).

## SECOND CLAIM FOR RELIEF

### The Final Rule Improperly Extends the Agencies' Authority Beyond the Limits of the Commerce Clause

77.     The preceding paragraphs are incorporated herein.

78.     The Constitution grants to Congress the power "to regulate commerce with foreign nations, and among the several states." U.S. Const. art. I, § 8. Courts are not to "lightly assume that Congress intended to infringe constitutionally protected liberties or usurp power constitutionally forbidden it." *Edward J. DeBartolo Corp. v. Florida Gulf Coast Bldg. & Constr. Trades Council*, 485 U.S. 568, 575 (1988). An agency interpretation of a statute that would cause the statute to extend to the outer limits of Congress' constitutional authority is impermissible unless Congress clearly expressed such an intention. *Id.*

79.     In *SWANCC*, the Supreme Court not only recognized that federal regulation of small water bodies would impinge on the scope of the commerce power as limited by that court's decisions in *United States v. Lopez*, 514 U.S. 549 (1995), and *United States v. Morrison*, 529 U.S. 598 (2000). *SWANCC*, 531 U.S. at 173. The Supreme Court raised similar concerns in *Rapanos* over the Army's broad interpretation of tributaries and adjacent wetlands. "Likewise, just as we noted in *SWANCC*, the Army's interpretation

stretches the outer limits of Congress's commerce power." *Rapanos*, 547 U.S. at 738 (Scalia, J., for the plurality). But here, the Final Rule goes even further than the interpretation of "navigable waters" advanced in those cases.

80.     The Final Rule includes "all waters" which are, have been, or reasonably could be used "in interstate or foreign commerce." 33 C.F.R. § 328.3(a)(1); 80 Fed. Reg. 37, 104 (June 29, 2015). This would include waters included within *The Daniel Ball* definition of navigable waters of the United States, which are limited to those waters that can be used to transport interstate commerce. 77 U.S. at 563. This is consistent with the Supreme Court's statement that the Clean Water Act's application is limited to Congress' traditional concern with navigation. But the Final Rule extends far beyond, to include waters merely used in or related to interstate commerce.

81.     Therefore, the Final Rule is contrary to law, in violation of the Administrative Procedure Act. *See* 5 U.S.C. § 706(2).

### THIRD CLAIM FOR RELIEF

### The Final Rule Violates State Sovereignty Reserved under the Tenth Amendment

82.     The preceding paragraphs are incorporated herein.

83.     The Tenth Amendment provides that "[t]he powers not delegated to the United States by the Constitution . . . are reserved to the States respectively, or to the people." U.S. Const. amend. X.

84.    The Tenth Amendment reserves to the States the power to regulate interstate land and water usage. *See Hess v. Port Auth. Trans-Hudson Corp.*, 513 U.S. 30, 44 (1994) ("regulation of land use [is] a function traditionally performed by local governments").

85.    In *SWANCC*, the Supreme Court held that federal regulation of small ponds and mudflats "would result in a significant impingement of the States' traditional and primary power over land and water use." 531 U.S. at 174.

86.    The Final Rule extends federal jurisdiction so far into local land and water resources that it necessarily undermines State power, in violation of the Tenth Amendment. The Tenth Amendment provides that "[t]he powers not delegated to the United States by the Constitution . . . are reserved to the States respectively, or to the people." U.S. Const. amend. X. Congress expressly acknowledged the prerogative of the States to regulate local land and water use in the Clean Water Act itself: "It is the policy of the Congress to recognize, preserve and protect the primary responsibilities and rights of the States to prevent, reduce, and eliminate pollution, to plan the development and use (including restoration, preservation, and enhancement) of land and water resources . . . ." 33 U.S.C. § 1251(b). Rather than preserve and protect these rights and responsibilities, the Final Rule eviscerates them.

87.    Therefore, the Final Rule is contrary to law, in violation of the Administrative Procedure Act. *See* 5 U.S.C. § 706(2).

## FOURTH CLAIM FOR RELIEF

### The Army Violated the Procedural Mandates of the National Environmental Policy Act

88.     The preceding paragraphs are incorporated herein.

89.     The National Environmental Policy Act requires federal agencies to prepare Environmental Impact Statements for all "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C).

90.     The Army was subject to the procedural mandates of the National Environmental Policy Act when promulgating the Final Rule.

91.     The Army's decision to forgo preparation of an Environmental Impact Statement in favor of an Environmental Assessment and Finding of No Significant Impact violates the National Environmental Policy Act because the Final Rule is a "major Federal action" subject to 42 U.S.C. § 4332(2)(C). Despite repeated public pronouncements by EPA and Army officials to the contrary, the Army admits in its Finding of No Significant Impact that federal jurisdiction under the Final Rule will expand between 2.8 and 4.6 percent as compared to historical determinations of jurisdiction, an estimate that may grossly understate the impact of the Rule. *See Army, Finding of No Significant Impact, Adoption of the Clean Water Rule: Definition of Waters of the United States*, at 2 (May 26, 2015). The Final Rule is highly controversial, as evidenced by approximately 35 states formally opposing the Proposed Rule during the public comment period, and its jurisdictional overreach will create precedent for future actions. The Army failed to appropriately consider the additional regulatory and economic burdens placed on states and

regulated entities and has not fully analyzed the true effects on the human environment. The Army also failed to consider a reasonable range of alternatives to the proposed federal action, failed to take a hard look at the projected effects of the Final Rule, and failed to ensure sufficient public participation in the National Environmental Policy Act process.

92.    The Army's action violates the National Environmental Policy Act and should be set aside as "arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). The Final Rule was also not adopted in "observance of procedure required by law." *Id*. § 706(2)(D).

## FIFTH CLAIM FOR RELIEF

### The Final Rule Is Arbitrary and Capricious in Violation of the Administrative Procedure Act

93.    The preceding paragraphs are incorporated herein.

94.    The Agencies' decisions in support of the Final Rule must be based on the evidence before the agency and rationally connected to the facts found. *Anderson v. U.S. Dep't of Transp.*, 213 F.3d 422, 423 (8th Cir. 2000). The Agencies must provide reasonable and satisfactory explanations for the decisions that were made.

95.    The Final Rule is arbitrary and capricious because it asserts per se jurisdiction over all waters that fall within the Rule's definition of "tributary" and "adjacent waters." The Final Rule is also arbitrary and capricious because it asserts jurisdiction over purely intrastate waters and related features based solely on their relationship with non-navigable interstate waters, and waters alone or in combination with "similarly situated waters" that have a "significant nexus" to a primary water or significantly affect the

chemical, physical, or biological integrity of a primary water. Each of these jurisdictional tests are arbitrary and capricious because the evidence in the record does not support them.

96.     The Final Rule is also arbitrary and capricious because it relies on definitions and concepts that lack sufficient clarity to meaningfully guide the States and potentially regulated parties in determining whether waters fall within federal jurisdiction.

97.     For example, the Agencies' intend to establish jurisdiction for "adjacent" waters by reference to 100-year floodplains, but admit that existing information on the location of 100-year floodplains may be unreliable and that many portions of the country have not been mapped to clearly identify 100-year floodplain locations. *See* 80 Fed. Reg. at 37, 081. The Clean Water Act therefore provides no intelligible principle for determining which upstream non-navigable waters are included and which are not.

98.     This lack of clarity is especially problematic given that the Clean Water Act imposes criminal penalties for violations of its protections of "navigable waters." 33 U.S.C. § 1319(c).

99.     The term "navigable waters" in the Clean Water Act is thus void for vagueness, in violation of the Due Process Clause of the U.S. Constitution, if it is interpreted to include other than navigable-in-fact waters and the territorial seas.

100.     Therefore, the Final Rule is contrary to law, in violation of the Administrative Procedure Act. *See* 5 U.S.C. § 706(2).

## SIXTH CLAIM FOR RELIEF

### The Agencies Violated the Procedural Requirements
### of the Administrative Procedure Act

101.   The preceding paragraphs are incorporated herein.

102.   Federal agencies must conduct rulemaking in accord with the Administrative Procedure Act which requires public notice of substantive rule changes and an opportunity for public comment on those changes. 5 U.S.C. § 553(b), (c).

103.   Among other things, the Final Rule substantially changed the category of "adjacent waters" from the proposed rule by including a definition of "neighboring" that includes: (1) all waters located within 100 feet of the ordinary high water mark of certain waters; (2) all waters within the 100-year floodplain and 1,500 feet of the ordinary high water mark of certain waters; and (3) all waters located within 1,500 feet of the high tide line of certain waters. This change was not subject to public review and comment.

104.   The Final Rule substantially changed the category of "other waters" from the proposed rule by aggregating normally isolated waters to determine if they will have a "significant nexus" with downstream navigable-in-fact waters including: Prairie potholes; Carolina and Delmarva bays; pocosins; western vernal pools in California; and Texas coastal prairie wetlands. This change was not subject to public review and comment.

105.   The Final Rule also substantially changed the category of "other waters" from the proposed rule by allowing case-by-case analysis of all waters within 4,000 feet of any other covered water. This change was not subject to public review and comment.

106.   And, the Final Rule substantially changed the case-by-case analysis for determining a "significant nexus" from the proposed rule by defining such a nexus based on the effect of any one of nine factors including: (i) sediment trapping; (ii) nutrient recycling; (iii) pollutant trapping, transformation, filtering, and transport; (iv) retention and attenuation of flood waters; (v) runoff storage; (vi) contribution of flow; (vii) export of organic matter; (viii) export of food resources; and (ix) provision of life cycle dependent aquatic habitat (such as foraging, feeding, nesting, breeding, spawning, or use as a nursery area) for species located in certain waters. This change was not subject to public notice or comment.

107.   Based on these and other changes between the proposed and final versions of the Final Rule, Plaintiff-Intervenor's members were deprived of notice and an opportunity to comment on substantive changes to the proposed rule.

108.   The Agencies also violated the procedural requirements of the Administrative Procedure Act because they did not make available to the public during the comment period on the Proposed Rule all of the information relied on in developing the Proposed Rule, including, for example, information relating to the Agencies' connectivity analysis, information supporting the Agencies' analysis of the application of the Proposed Rule to jurisdictional determinations, and information supporting the Army's environmental effects analysis under the National Environmental Policy Act.

109.   Therefore, the Final Rule is invalid and should be set aside for procedural inadequacy under the Administrative Procedure Act. *See* 5 U.S.C. § 706(2).

**PRAYER FOR RELIEF**

Wherefore Plaintiff-Intervenor requests the Court to enter judgment in its favor and issue an order:

1. Declaring that the Final Rule is unlawful because it: (1) was issued in violation of the Clean Water Act, the National Environmental Policy Act, and the Administrative Procedure Act; (2) extends congressional authority beyond the limits of the Commerce Clause; and (3) interferes with state sovereignty in violation of the Tenth Amendment;

2. Vacating and setting aside the Final Rule in its entirety;

3. Issuing preliminary and permanent injunctive relief prohibiting the Agencies from using, applying, implementing, enforcing, or otherwise proceeding on the basis of the Final Rule;

4. Remanding the matter to the Agencies with instruction to issue a rule that complies with the Constitution, the statutory limits of the Clean Water Act, and the procedural mandates of the National Environmental Policy Act and the Administrative Procedure Act;

5. Awarding Plaintiff-Intervenor costs and attorneys' fees; and

6. Granting Plaintiff-Intervenor such additional relief as may be necessary and appropriate or as the Court deems just and proper.

DATED:  May 24, 2019.

Respectfully submitted:

**PACIFIC LEGAL FOUNDATION**
s/ Anthony L. Francois
ANTHONY L. FRANÇOIS
MOLLIE R. WILLIAMS*(*pro hac vice*)
DANIEL M. ORTNER*(*pro hac vice*)
930 G Street
Sacramento, California 95814
Telephone: (916) 419-7111
Facsimile: (916) 419-7747
Email: TFrancois@pacificlegal.org
Email: MWilliams@pacificlegal.org
Email: DOrtner@pacificlegal.org

**ATTORNEYS FOR PLAINTIFF-
INTERVENOR**

## CERTIFICATE OF SERVICE

I hereby certify that on May 24, 2019, I electronically filed the foregoing document with the Clerk of the Court via the CM/ECF system, which will cause a copy to be served upon counsel of record.

I further certify that on May 24, 2019 I served a copy of the foregoing document on the following parties or their counsel of record by U.S. Postal Service, via first class mail, in a sealed envelope, postage paid:

State of Nevada, Attorney General Aaron Ford
c/o Solicitor General Heidi Parry Stern
State of Nevada Office of the Attorney General
555 E. Washington Ave., Suite 3900
Las Vegas, NV 89101-1068

                                                  Anthony L. François

                                          ANTHONY L. FRANÇOIS